[No. 22892. Department Two. June 29, 1931.]

*In the Matter of the Estate of* JOHN F. ANDERSON,
*Deceased.*[1]

*Ray R. Greenwood,* for appellant.
*Marion Garland,* for respondent.

FULLERTON, J.—In this proceeding, the appellant, Irene York, petitioned for letters of administration

[1]Reported in 1 P. (2d) 231.

upon the estate of John F. Anderson, deceased, basing her right upon the claim that she was a niece of the deceased and his sole heir. The respondents A. P. Johnson, Mary C. Lundahl, and Clara Hillstrom, cousins of the deceased residing in Minnesota, answered the petition, denying that the petitioner was the next of kin or kin at all of the deceased, objecting to her appointment as administratrix and asking the appointment of the respondent Alice Holman, a more distant relative of the deceased residing at Bremerton, in this state. The superior court, after trying the issues of fact, found that the appellant was not an heir of the deceased and denied her petition, and appointed Alice Holman administratrix and adjudged that the appellant has no right, title, or interest in the estate. This appeal is from that order and judgment.

The ultimate fact in dispute is whether the appellant is the legitimate daughter of a brother of the deceased, Swan Anderson, and an Indian woman, her mother. Swan Anderson died September 13, 1889, a resident of Kitsap county, where he had resided and engaged in logging for many years. For four or five years before his death he had living with him as his wife a young Indian woman. A child was born of that union, and the appellant is that child. No proof of a ceremonial marriage was made or attempted at the trial. There was abundant evidence that, in the particular community in which they lived, Swan Anderson and the Indian woman acted and held themselves out and were recognized and reputed to be husband and wife, and that he treated the child as his own and evinced great affection for her. There was some evidence against the reputation of marriage, but, as we read it in the record, it seems less cogent than the other.

Inextricably intermingled with the evidence against the reputation of marriage was testimony as to the

practice of loggers in Kitsap county in early days of keeping Indian women about them in meretricious relations. Such testimony does not tend to meet positive evidence of a reputed marriage, but it may have been admissible for other purposes in this case. An Indian woman living with a white man not her husband was called by him and by others his ''woman'', or ''Klooch-man'', or ''Klooch''; and some of the respondents' witnesses testified that the appellant's mother was sometimes referred to in the same way both by Swan Anderson himself and by neighbors. This evidence lost all its force, however, when it was also testified by some, if not all, of the same witnesses on cross-examination, that when a white man was known actually to be married to an Indian woman, the very same names were usually applied to her.

In another application of the evidence of such illicit practice of loggers, there was a distinct advantage for the appellant. Swan Anderson himself was shown to have associated from time to time with different Indian women, first one and then another, prior to the beginning of his relations with the appellant's mother, but never afterwards. This is a fairly strong indication that he regarded his relations with her as different from the relations he had formerly had with other Indian women.

The strongest evidence against a presumption of marriage came from a brother of Swan Anderson, one Andy P. Anderson. This brother came from California shortly after Swan's death, and took charge of his business and family affairs. He seems to have been a man of intelligence and discretion, and of fair business ability. At one time he had resided in Pacific county, Washington territory, but apparently was a resident of California during the time his brother was living

with the appellant's mother. Whether he was then cognizant of their relations does not appear.

On September 26, 1889, he had himself appointed special administrator of his brother's estate, without mention of heirs. Later, he procured the appointment of a local resident as administrator, and caused the estate to be administered upon on the assumption that the appellant's mother was not the wife of his deceased brother, and that neither the mother nor the appellant had an interest in his estate.

His subsequent attitude towards the appellant, however, was in some respects somewhat inconsistent with that here assumed. He placed her in a children's home in Seattle under the name of "Irene Anderson", though she had theretofore been called "Ida." The records of the home show that she was entered there October 29, 1889, by her "Uncle Anderson" and that the mother was "not responsible." He informed his own mother in Minnesota that Swan had left an illegitimate child. He made a will in which he called her "Miss Irene Anderson, the daughter of my deceased brother, Swan Anderson," and in which he bequeathed to her a substantial sum of money. On his death, the appellant received the bequest.

There was also introduced in evidence by the respondents what appears to be an undated pencil copy of a letter written by Andy P. Anderson to one John Penson at Rosario, Washington. It is in the handwriting of Andy P. Anderson, and was produced from his files. The addressee, as we shall see later, was then the husband of the appellant's mother; and the woman named Celia, referred to in the letter, was a second daughter of Swan Anderson and the appellant's mother. The material parts of the letter follow:

"In answer to your last letter I will call your attention to the fact that I have never had any control or

charge of Ida at any time. When Ida's mother left Ida at the orphan home Ida's mother received $50 which money was paid her by Mrs. Smith the matron of the Home with the understanding that the orphan home had full charge of Ida and that her mother was not to bother any more. It was only on this condition that Mrs. Leary the President of the home would take Ida into the home. Mrs. Leary took advice from her husband lawyer John Leary who was well acquainted with Swan and all conditions bearing on his life. Mrs. Leary left orders at the orphan home for them not to receive Ida's mother on any visits as it might influence her future life.

"After Ida had been at the home for sometime a family that took Ida and gave her a home and sent her to school. Ida had a good home and remained with this family until she was of age then she got married with the consent of the family that had care of her. They were all strangers to me and I knew nothing of the marriage until they wrote to me. . . .

"Now another thing I wish to call to your attention to is this that Swan's estate was regularly administered upon in Kitsap County. Judge Ben Birschel was the administrator and full charge. I could not act as administrator as I was a citizen of Cal. Judge Birschel an old friend of Swan that knew all of Swan's affairs was the administrator and the records are to be found at any time in the Clerk's office, Kitsap Co.

[Here follow some details of the estate, to show that there was not sufficient to pay debts.]

"Celia's Mother at the time of Swan's death, laid her claim before the U. S. Attorney at that time. And he let her have $20.00 on the strength of what she reported. After investigating the matter he dropped it and lost his $20.00 as well as time and expense. I was informed Ida's Mother and a man by the name of Dan Gilmore as interpreter, had been up to see the U. S. Attorney, and I called upon him to see if he was going to have an administrator appointed for the woman. Then he gave me the above particulars and remarked that he would have nothing further to do with it. But for me to go ahead and apply for an administrator which I did."

The trial judge took the case under advisement, and filed a memorandum decision about ten days after the trial, wherein he discussed the evidence and stated his reasons for concluding that a valid marriage had not been established. The appellant thereupon moved for a new trial on the ground, among others, of newly discovered evidence, a definite clue to which was first disclosed to the appellant and her counsel during the then recent trial. Vague rumors had theretofore reached them that the appellant's mother might have had a second child, but nothing sufficiently definite to constitute evidence had been discovered until the production, during the trial, of the copy of the letter from Andy P. Anderson to John Penson, a part of which is quoted above. This clue led to the finding of Celia Obi, second daughter of Swan Anderson, on or near Neah Bay Indian Reservation in this state.

An affidavit by Celia Obi, with one by her husband, Ole Obi, corroborating her, are among those presented in support of the motion for a new trial. The affidavit of Celia Obi shows that she is about forty years of age; that there had always been a close companionship between her and her mother, Mary Anderson, throughout the latter's life; and that from her mother the affiant had learned the·following facts of family history:

The mother (whom we shall call Mary) and her father were passing Port Blakely in 1885 on their way to pick hops at Kent, when they were met by John Penson, who was a relative of Swan Anderson and the husband of Mary's sister. He took Mary to visit her sister at their home near Swan Anderson's camp. While she was there, Swan Anderson asked Mary to marry him, and they were married by a priest in the presence of John Penson and his wife, Mary's sister. Ida, the first child of the marriage, was about two

years older than Celia, who was born shortly before Swan Anderson's death during a visit of the mother to her people at Kyuquot, British Columbia. After Swan Anderson's death, Andy P. Anderson took both children to the children's home in Seattle, thereby attempting to take them away from the mother. He is reported to have said he wanted to adopt them and raise them as his own. The mother begged and entreated, and finally was allowed to take Celia upon condition that she should leave Ida at the home and promise not to bother her or see her. The promise was exacted from her through fear of losing both children. Mary remained single for four years and then married John Penson, with whom she lived twelve years until his death. Years later, she married James Johnson and lived with him until her death on September 3, 1916.

The affidavit also gives the following as facts from the affiant's own recollection: Celia and her mother on two different occasions made trips to see Andy P. Anderson. He told them that he was acting as guardian for Celia and Ida, and that when the former became of age he would see that she got some money. Andy P. Anderson visited at the home of Celia and her mother when they lived in Seattle and talked of Ida and said she was still in the children's home. They went to the home at different times to try to see Ida, but were told that she was not there and that there was no such name on the books. Years later, Andy P. Anderson told them that Ida had married and gone to California and had died. The mother grieved and worried all her life for her older daughter.

The facts stated in this affidavit were related before the affiant was informed that there was an estate in which she might have an interest, or that her sister, the appellant, was still living.

The trial judge denied the motion for a new trial on the sole ground that, even if Celia Obi and her husband should testify before him as they indicated they would by their affidavits, he could not believe the story learned by them from the Indian mother. There were two reasons assigned for this lack of confidence, namely, that it was unnatural for the mother, knowing that she was the lawful wife of Swan Anderson, to sacrifice one of her children "upon the bargain that she might keep the other," and that she had consulted the district attorney about the estate and then done nothing about either the estate or the children.

There are some considerations affecting these reasons that the trial judge may not have taken into account. His oral opinion given at the close of the argument of the motion for a new trial, does not indicate that he weighed them. The woman was an Indian, far away from her own people. She was indigent and helpless, with two infants to care for besides herself. By allowing the older one to be taken into the children's home, she was not sacrificing it, but assuring herself that it would be well cared for and protected, leaving her the better able to maintain the younger child and herself. Whether the children were legitimate or not, her right to their custody was the same, and she presumably was so advised by the district attorney, if he advised her at all in the matter of the children. As to the estate, evidently it was estimated to be, as it afterwards proved to be, worthless so far as any right of inheritance was concerned, and it does not appear that there was a homestead or any other property to which a widow would have been entitled in preference to creditors.

While we should not be disposed to disturb the finding expressed by the trial judge in his written memorandum based upon the evidence as it stood at the close

of the trial (though, from the written record, some of the respondents' evidence, as we have intimated, does not impress us as forcibly as apparently it did the trial judge), we are of the opinion that the newly discovered evidence ought to have been received. Given orally by the witnesses in person before the court, the evidence may not have the weight it appears to have from the affidavits; but, on the other hand, it may have even more. The trial court can determine that when the evidence is heard.

The order and judgment appealed from are reversed, with directions to the trial court to open the case and admit the newly discovered evidence proffered with the motion for new trial and such other evidence on the same subjects, not before known to the appellant, as may be discovered by the time of the hearing. The court will admit evidence offered by the respondents counter to the new evidence introduced by the appellant, with evidence in rebuttal, if any, in the usual way; and will then decide the controversy upon all of the evidence before it.

TOLMAN, C. J., BEELER, MILLARD, and BEALS, JJ., concur.